IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMERICAN CASUAL DINING, L.P.,
a Texas limited partnership,

    Plaintiff,

      v.

MOE'S SOUTHWEST GRILL,
L.L.C.,

    Defendant.

CIVIL ACTION FILE
NO. 1:04-CV-3356-TWT

## OPINION AND ORDER

This is a breach of contract action arising out of a franchise agreement.  It is before the Court on the Defendant's Motion to Dismiss [Doc. 3].  The Joint Motion For Extension of Stay [Doc. 33] is DENIED.   For the reasons set forth below, the Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

Plaintiff American Casual Dining, L.P. ("American Casual") is a Texas limited partnership with its principal place of business in Dallas, Texas.  Larry Klinghoffer and James Hammond are American Casual's principals.  Defendant Moe's Southwest Grill, L.L.C. ("Moe's") is a Georgia limited liability corporation with its principal place of business in Atlanta, Georgia.  Moe's is in the business of franchising quick

service Mexican restaurants that operate under the franchise name of "Moe's Southwest Grill."  (Compl., Ex. E.)  In December of 2002, American Casual began discussions with Moe's regarding American Casual's interest in becoming a franchisee for Moe's Southwest Grill restaurants.  The Federal Trade Commission requires a franchisor to disclose certain information to prospective franchisees, typically in the form of a Uniform Franchise Offering Circular ("UFOC").  Thus, in connection with their discussions, Moe's presented American Casual with its 2002 UFOC.  (Compl., Ex. A.)  The UFOC contained information regarding the initial franchise fee, royalty fees, and advertising fees.  (Compl., Ex. A Item 5-6.)  In addition, the UFOC provided an estimate of the "initial investment" required to develop and open a Moe's Southwest Grill restaurant.  The initial investment figure included such things as the franchise fee, lease payments, construction costs, furniture and equipment expenses, and opening inventory expenses.  (Compl., Ex. A Item 7.) According to American Casual, Moe's also made oral representations during the negotiations regarding the food and labor costs that a franchisee should expect to incur in association with a Moe's Southwest Grill restaurant.

On April 25, 2003, American Casual executed a Market Development Agreement[1] and a Franchise Agreement.[2]  Pursuant to the Market Development Agreement, Moe's agreed to grant exclusive territorial rights to American Casual provided that American Casual develop, open, and operate twenty Moe's Southwest Grill restaurant franchises in and around the Dallas/Fort Worth area over a specified time period.  The Market Development Agreement reduced the required franchise fee per restaurant and stated that a separate franchise agreement would be provided for each restaurant developed by American Casual.  (Compl., Ex. D.)  The parties also executed a Development/Exclusivity Agreement that reiterated the grant of the exclusive franchise territory and provided that "[u]pon execution of this Agreement, Moe's shall undertake the appropriate acts to make Klinghoffer and Hammond members of Moe's governing board."  (Compl., Ex. E ¶¶ 1, 4, 11.)  Pursuant to these agreements, American Casual opened three Moe's Southwest Grill restaurants in the Dallas/Fort Worth area between November 2003 and April 2004.  According to American Casual, the initial investment expenses associated with these restaurants far exceeded the estimates included in the UFOC.  (Compl. ¶¶ 64-66.)  American Casual

_____

[1]The Market Development Agreement is identified as "Exhibit C to the Offering Circular."  (Compl., Ex. D.)

[2]The parties executed an amendment to the Market Development Agreement on June 19, 2003, and two amendments to the Franchise Agreement on April 25, 2003.

alleges that Moe's represented that the maximum initial investment for three franchise restaurants was $814,500, but that it has spent in excess of $1,430,000 to date. (Compl. ¶ 67-68.)  American Casual further alleges that its actual food and labor costs exceeded those represented during the franchise negotiations, resulting in substantial monthly losses at its three locations.  (Compl. ¶¶ 74-78.)

American Casual asserts a number of claims arising out of the Franchise Agreement and related documents.  Specifically, American Casual asserts a claim for violation of the Georgia Sale of Business Opportunities Act, O.C.G.A. § 10-1-417; fraud; negligent misrepresentation; breach of contract; breach of the duty of good faith and fair dealing, O.C.G.A. § 11-1-203; promissory estoppel; and unjust enrichment. Moe's moves to dismiss these claims.  American Casual also asserted a claim under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.46.  However, the parties jointly stipulated to dismissal of that claim with prejudice [Doc. 17].

## II.  MOTION TO DISMISS STANDARD

A complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief.  Fed. R. Civ. P. 12(b)(6); see Conley v. Gibson, 355 U.S. 41, 47 (1957); Linder v. Portocarrero, 963 F.2d 332 (11th Cir. 1992).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the

light most favorable to the plaintiff.  See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983).  Generally, notice pleading is all that is required for a valid complaint.  See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986).  Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  Id.

III.  DISCUSSION

A.    Georgia Sale of Business Opportunities Act

The Georgia Sale of Business Opportunities Act ("GSBOA"), O.C.G.A. § 10-1-410 et seq., prohibits a "business opportunity seller or multilevel distribution company" from using untrue or misleading statements in connection with a business opportunity.  O.C.G.A. § 10-1-417(a).  Moe's argues that the GSBOA does not apply in this case because the sale of a franchise does not constitute a "business opportunity."  For purposes of the GSBOA, "business opportunity" is defined, in relevant part, as follows:

> [T]he sale or lease of, or offer to sell or lease, any products, equipment, supplies, or services for the purpose of enabling the purchaser to start a business and in which the seller or company represents . . .[t]hat the company, in conjunction with any agreement which requires a total initial payment of an amount exceeding $500.00, will provide a sales program or marketing program; *provided, however, that this subparagraph shall not apply to the sale of a sales program or a*

> *marketing program made in conjunction with the licensing of a*
> *registered trademark or service mark.*

O.C.G.A. § 10-1-410(2)(A)(iii) (emphasis added).  Moe's contends that franchises fall within the exemption of sales and marketing programs made in conjunction with the licensing of registered trademarks and service marks.  This exemption has not been interpreted by the Georgia courts; however, a Florida district court, interpreting nearly identical language in an analogous Florida statute, held that the sale of a restaurant franchise fell within the exception.[3]  <u>Barnes v. Burger King Corp.</u>, 932 F. Supp. 1420, 1433-34 (S.D. Fla. 1996); <u>see</u> Fla. Stat. Ann. § 559.801(1)(a)(4).  Although it appears that most franchise operations would fall outside the definition of "business opportunity," the Court need not decide whether franchises are per se exempted.  <u>See</u> 4 Ga. Jur. Private Franchise Agreements § 3:11 ("O.C.G.A. § 10-1-410(2)(A)(iii) provides an exemption for most franchise operations by excluding the sale of marketing programs made in conjunction with the licensing of registered trademarks and registered service marks.").  Even if the exemption was limited, the sale at issue

---

[3]American Casual argues that the Fourth Circuit Court of Appeals permitted a claim against a franchisor under the North Carolina Business Opportunity Sales Act, which includes a similar exemption for the sale of marketing programs in connection with the licensing of registered trademarks or service marks.  <u>Martin v. Pilot Indus.</u>, 632 F.2d 271 (4th Cir. 1980).  However, the Fourth Circuit did not address whether the sale of a franchise fell within that particular exemption.  Instead, the court relied on a separate definition of "business opportunity" that does not appear in the GSBOA.  <u>Id.</u> at 274-75.

here is clearly excepted from the GSBOA definition of "business opportunity." It is undisputed that the sales and marketing programs associated with the Moe's franchise system were provided to American Casual in conjunction with the licensing of registered trademarks and service marks. (Compl., Ex. A Item 13; Compl., Ex. G ¶ 13.)[4] Thus, the GSBOA does not apply here and the claim fails as a matter of law.

B.    Fraud

To establish a fraud claim under Georgia law, a plaintiff must establish: (1) a false representation by the defendant; (2) scienter; (3) an intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff proximately caused by the reliance. Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1027 (11th Cir. 2003); Smiley v. S & J Invs., Inc., 260 Ga. App. 493, 499 (2003). American Casual's fraud claim is predicated on the following alleged misrepresentations: (1) the "initial investment" costs associated with developing and opening a Moe's Southwest Grill restaurant were between $164,500 and $271,500; (2) Moe's had the experience, knowledge, and expertise necessary to

---

[4]When the plaintiff refers to certain documents in the Complaint and those documents are central to the plaintiff's claim, the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal. Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc., 117 F. Supp. 2d 1357, 1361 n.2 (N.D. Ga. 2000) (citing Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)).

estimate the "initial investment" costs accurately; (3) Moe's had perfected a system of opening and operating its restaurants; and (4) Larry Klinghoffer and James Hammond would be appointed to Moe's governing board.  (Compl. ¶¶ 117-21.)

Fraud cannot be based on misrepresentations that the plaintiff could not justifiably rely upon.  GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc., 245 Ga. App. 460, 464 (2000).  Thus, "a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event.  Fraud cannot consist of mere broken promises, unfulfilled predictions or erroneous conjecture as to future events."  Next Century Commc'ns Corp., 318 F.3d at 1027 (quoting Fuller v. Perry, 223 Ga. App. 129, 131(1996)); see also Equifax, Inc. v. 1600 Peachtree, L.L.C., 268 Ga. App. 186, 195 (2004) ("The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future.  Nor does actionable fraud result from a mere failure to perform promises made.").  In addition, parties are not justified in relying upon representations that are "general commendations or mere expressions of opinion, hope, expectation and the like."  Anderson v. Atlanta Comm. for the Olympic Games, 261 Ga. App. 895, 900 (2003); see also Fuller, 223 Ga. App. at 131.  Applying these principles, a number of the alleged misrepresentations probably do not form the basis of a fraud claim.  Specifically, any representations regarding Moe's experience, knowledge, skill, or

expertise in estimating expenses or creating a system of opening and operating restaurants are merely opinions and statements of commendation, or "puffing." A party is expected to profess competency in its area of business. Thus, such expressions of experience and skill are considered puffery upon which a plaintiff cannot justifiably rely. See Fitzgerald Forest Prods., L.P. v. Durand Raute Corp. of Oregon, 932 F. Supp. 293, 295 (M.D. Ga. 1996) ("Attesting to a principal's 'competency' within its own area of manufacture is to be expected" and is nonactionable puffery.); Charter Med. Mgmt. Co. v. Ware Manor, Inc., 159 Ga. App. 378, 383 (1981) (alleged misrepresentations regarding defendant's expertise and experience in profitably running nursing homes were mere commendation or "puffing" and not actionable). The Court cannot, however, at the pleading stage say that these claims fail as a matter of law. The issue may be revisited at the summary judgment stage.

Moe's argues that American Casual cannot state a claim for fraud based on the "initial investment" representations because these figures were merely estimates of future costs. As noted, fraud cannot be based on "unfulfilled predictions or erroneous conjecture as to future events." Next Century Commc'ns Corp., 318 F.3d at 1027. Estimated start-up expenses for a particular restaurant appear to fall within this exclusion. See Hague Travel Agency, Inc. v. Travel Agents Int'l, Inc., 808 F. Supp.

569, 572 (E.D. Mich. 1992) (statement that "total investment of capital necessary would be about $85,000.00" was a nonactionable prediction).  Moreover, Moe's contends that American Casual cannot establish the requisite justifiable reliance on these figures based on disclaimer language in the UFOC.  "A party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of an applicable offering statement."  Carlock v. Pillsbury Co., 719 F. Supp. 791, 829 (D. Minn. 1989) (citing Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 416 (1st Cir. 1989); Kennedy v. Josephthal & Co., 814 F.2d 798, 805 (1st Cir. 1987); Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1518 (10th Cir. 1983)).  Here, the UFOC provides a range of approximate costs for lease payments; furniture, fixtures, and equipment; opening inventory; and miscellaneous opening costs.  As the UFOC explains, however, the costs associated with these items will vary based on the actual rental prices in the area of the restaurant as well as any location-specific requirements or regulations.  (Compl., Ex. A, UFOC Item 7.)  Furthermore, the initial investment figure includes an estimation of additional funds necessary during the initial months of business.  The UFOC explains this figure as follows:

> This estimates your initial start up expenses during the first 3 months following the opening of your restaurant.  These expenses include payroll costs.  This estimate is based on start-up expenses actually experienced by Company-owned MOE'S SOUTHWEST GRILL restaurants opened during the Company's calendar year ended December 31, 2000. *These figures are estimates and we cannot guarantee that you*

*will not have additional expenses starting the business. Your costs will depend on factors such as: how much you follow our methods and procedures; your management skill; experience and business acumen; local economic conditions; the local market for our product; the prevailing wage rate; competition; your rent or mortgage payments; and the sales level reached during the initial period.*

(Id.) (emphasis added).  Although the estimates were based on the initial expenses experienced by past restaurant locations, this disclaimer language indicates that the figures were not intended as a forecast of the actual cost to any particular franchisee. Again, however, the Court cannot say that this claim fails as a matter of law based upon the pleadings.  The issue may be revisited at summary judgment.

      C.     Negligent Misrepresentation

     American Casual asserts a negligent misrepresentation claim based on the same misrepresentations that form the basis of its fraud claim.  In addition, American Casual alleges that Moe's falsely represented approximate food and labor costs. Negligent misrepresentation is similar to fraud and requires the same elements of proof, the only difference being whether the defendant knowingly or negligently made the misrepresentations.  Prince Heaton Enters., Inc., 117 F. Supp. 2d at 1360; Anderson, 261 Ga. App. at 900.  A claim for negligent misrepresentation requires proof that: (1) the defendant negligently supplied false information to foreseeable persons, known or unknown; (2) such persons reasonably relied upon that information; and (3) economic injury proximately resulted from that reliance.

MacIntyre & Edwards, Inc. v. Rich, 267 Ga. App. 78, 82 n.14 (2004) (citing

Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 267 Ga. 424, 426

(1997)); see also Next Century Commc'ns Corp., 318 F.3d at 1030.

Moe's contends that American Casual cannot state a claim for negligent

misrepresentation as a matter of law because the tort applies only in limited

circumstances.  Relying on Simpson Consulting, Inc. v. Barclay Bank PLC, 227 Ga.

App. 648 (1997), Moe's asserts that a claim for negligent misrepresentations arises

only where a professional hired by a particular party prepares a document containing

error and misrepresentations and a third party relies upon the erroneous document to

his detriment.  In Simpson Consulting, the Georgia Court of Appeals stated that the

standard applicable to negligent misrepresentation "applies under very limited factual

circumstances that would give a right of action for professional malpractice, but for

the absence of 'privity.'"  Simpson Consulting, 227 Ga. App. at 652.  Accordingly,

Moe's argues that because it is not a professional providing expert opinions to others

for a fee and cannot be sued for malpractice that it likewise cannot be held liable for

negligent misrepresentation.

This Court previously declined to construe the applicability of negligent

misrepresentation as narrowly as Moe's suggests.  See Snyder v. Time Warner, Inc.,

179 F. Supp. 2d 1374, 1384-85 (N.D. Ga. 2001) (citing Simpson Consulting, 227 Ga.

App. at 651-52).   In <u>Snyder</u>, the Court applied the standard for negligent misrepresentation set forth in section 552 of the Restatement (Second) of Torts and adopted by the Georgia Supreme Court in <u>Robert & Co. Associates v. Rhodes-Haverty Partnership</u>, 250 Ga. 680, 681-82 (1983).   In <u>Robert & Co. Associates</u>, the Georgia Supreme Court held that:

> [O]ne who supplies information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used.   This liability is limited to a foreseeable person or limited class of persons for whom the information was intended, either directly or indirectly.

<u>Robert & Co. Assocs.</u>, 250 Ga. at 681-82, <u>quoted in</u> <u>Snyder</u>, 179 F. Supp. 2d at 1385. This remains the standard for negligent representation claims in Georgia.   <u>See, e.g.</u>, <u>BDO Seidman, LLP v. Mindis Acquisition Corp.</u>, 276 Ga. 311 (2003) (applying standard set forth in <u>Robert & Co. Assocs.</u>); <u>Marquis Towers, Inc. v. Highland Group</u>, 265 Ga. App. 343, 347 (2004) (same); <u>Martha H. West Trust v. Market Value of Atlanta, Inc.</u>, 262 Ga. App. 90, 92 (2003) (same).   Nevertheless, Moe's urges the Court to reconsider its interpretation of the scope of negligent misrepresentation in light of two Georgia Court of Appeals decisions issued subsequent to <u>Snyder</u>. Specifically, Moe's maintains that <u>Smiley v. S & J Investments, Inc.</u>, 260 Ga. App. 493 (2003) (physical precedent) and <u>Marquis Towers, Inc. v. Highland Group</u>, 265

Ga. App. 343 (2004), which relies on <u>Smiley</u>, reinforce the limitation set forth in

<u>Simpson Consulting</u>.  In <u>Smiley</u>, the court stated that:

> The theory of liability for negligent misrepresentation *generally* applies to the professional defendants only, who provide information that is false through failure to exercise reasonable care or competence in obtaining information that is relied upon by a third party and such reliance is foreseeable.

<u>Smiley</u>, 260 Ga. App. at 496 (emphasis added).  However, the plaintiff in that case

also asserted a negligent misrepresentation claim against the sellers of real property,

i.e., nonprofessionals, based on statements made in a "Seller's Property Disclosure

Statement."  <u>Id.</u> at 493, 496.  The court expressly recognized that under some

circumstances those defendants could be liable for negligent misrepresentation if the

false information was provided as part of a transaction in which the defendant had a

pecuniary interest and the plaintiff justifiably relied on the information to his

detriment.  <u>Id.</u> at 496-97 (quoting <u>Robert & Co. Assocs.</u>, 260 Ga. App. at 681).  Thus,

even the case relied upon by Moe's implicitly rejected limiting the application of

negligent misrepresentation to professional defendants.

    The Court is not persuaded that the applicability of negligent misrepresentation

is limited beyond the scope set forth by the Georgia Supreme Court.  Nothing in the

standard set forth in <u>Robert & Co. Associates</u> restricts the applicability of negligent

misrepresentation to circumstances of professional malpractice.  Rather, a claim for

-14-

negligent misrepresentation is limited to situations where the alleged misrepresentation is made "during the course of [the defendant's] business, profession, employment, or in any transaction in which he has a pecuniary interest." Robert & Co. Assocs., 250 Ga. at 681-82. It cannot be disputed that the information forming the basis of this claim was provided by Moe's during the course of its business and concerned a transaction in which Moe's had a pecuniary interest. Thus, provided that it can establish the additional requisite elements, American Casual is not precluded from asserting a negligent misrepresentation claim against Moe's. Therefore, the motion to dismiss is denied as to this claim.

Additionally, American Casual alleges that Moe's is liable for negligent misrepresentation because Moe's represented that food costs would be approximately 23-27% of food sales and that labor costs for direct staff would be approximately 16-20% of gross sales. According to American Casual, these representations were made in connection with the presentment of the UFOC. (Compl. ¶¶ 18-20.) The estimates, however, are not included in the UFOC nor do they appear in the subsequent agreements. Instead, the Franchise Agreement contains the following merger and integration clause:

> This agreement and any addendum hereto contains the entire agreement between the parties hereto relating to the operation of the restaurant at the Franchised Site and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, that

have been relied upon by the parties other than those set forth herein and in the Uniform Franchise Offering Circular.  No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by all interested parties.

(Compl., Ex. G ¶ 34.)    In addition, the Franchise Agreement includes an acknowledgment by the franchisee of the risks associated with undertaking a franchise and provides, in pertinent part, that:

> FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO FRANCHISEE OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR PROVIDED TO FRANCHISEE AND THAT FRANCHISEE HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR AND FRANCHISEE'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

(Id. ¶ 35(b).)  American Casual expressly acknowledged that it did not rely upon representations that were not set forth in the UFOC or Franchise Agreement, and it cannot claim to have done so now.

In written contracts containing a merger clause, "prior or contemporaneous representations that contradict the written contract 'cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.'" First Data POS, Inc. v. Willis, 273 Ga. 792, 795 (2001) (quoting Campbell

v. C & S Nat'l Bank, 202 Ga. App. 639, 640 (1992)).  "[W]here parties enter into a final contract all prior negotiations, understandings, and agreements on the same subject are merged into the final contract, and are accordingly extinguished." Health Serv. Ctrs. v. Boddy, 257 Ga. 378, 380 (1987).  When a contract contains a merger clause that establishes that the written contract completely represents all of the parties' agreement, a plaintiff cannot prove that it justifiably relied on alleged misrepresentations not contained within the contract. Liberty v. Storage Trust Props., L.P., 267 Ga. App. 905, 910 (2004).  Thus, the merger and acknowledgment clauses contained in the Franchise Agreement preclude American Casual's negligent misrepresentation claim based on the precontractual representations regarding food and labor costs. See Charter Med. Mgmt. Co. v. Ware Manor, Inc., 159 Ga. App. 378, 384 (1981) (merger clause precluded plaintiff from proving reasonable reliance on representations not contained in contract); see also Cook v. Little Ceasar Enters., Inc., 210 F.3d 653, 658 (6th Cir. 2000) (existence of an integration clause in the franchise agreements made the buyer's alleged reliance on prior representations unreasonable); Wootton Enters., Inc. v. Subaru of Am., 134 F. Supp. 2d 698, 715 (D. Md. 2001) (any actionable statements made during negotiations were superceded by fully integrated franchise agreement and could not reasonably be relied upon by the franchisee).

      D.    Breach of Contract

Moe's argues that American Casual fails to state a claim for breach of contract because it does not identify any actual contractual provision that was breached.  The Complaint alleges that Moe's breached its contractual obligations in the following ways: (1) failing to perfect and make available a system of opening and operating Moe's Southwest Grill restaurants; (2) failing to use its skill, experience, knowledge, and expertise to provide a reasonable and accurate statement of the initial investment expenses and food and labor costs; and (3) failing to use its skill, experience, knowledge, and expertise to assist American Casual in developing, opening, and operating an economically viable restaurant franchise.  (Compl. ¶ 146.)  Rather than identifying any specific contractual provisions that obligated Moe's to provide these services, American Casual argues that "the complaint's breach allegations go broadly to the heart of the parties' agreements -- establishing a successful franchise."  (Pl.'s Resp., at 17.)

The introductory portion of the Franchise Agreement contains the following clauses:

> WHEREAS, Franchisor at a substantial expenditure of time, effort and money has developed and perfected a system of opening and operating MOE'S SOUTHWEST GRILL restaurants (the "MOE'S system); and

> . . .

> WHEREAS, Franchisor has acquired knowledge and experience in the composition, distribution, advertising and sale of food products by restaurants using the MOE'S system . . . .

(Compl., Ex. G, p. 56; see also Ex. D, p. 44.)  However, these representations, and the remaining portions of the introduction, simply identify efforts on the part of the franchisor to develop its restaurant.  They do not obligate Moe's to act in any specific way on behalf of American Casual.  Moreover, Moe's expressly disclaimed any duty to assist American Casual in developing and operating an economically viable restaurant.  The Franchise Agreement provides that:

> Franchisee assumes sole responsibility for the operation of the business Franchised hereunder and acknowledges that, while Franchisor may furnish advice and assistance to Franchisee from time to time during the term of this agreement, Franchisor has no legal or other obligation to do so except as specifically set forth herein.  In addition, Franchisee acknowledges that Franchisor does not guarantee the success or profitability of the business Franchised hereunder in any manner whatsoever and shall not be liable therefor . . . .

(Compl., Ex. G ¶ 35(a).)  Because American Casual cannot point to any contractual provision that Moe's breached by failing to act in the manner set forth above, American Casual cannot state a claim for breach of contract based on these allegations.  See Adkins v. Cagle Foods JV, LLC, 411 F.3d 1320, 1327 (11th Cir. 2005) (breach of contract claim failed because plaintiffs could not identify any contractual provision breached by defendant); Barnes, 932 F. Supp. at 1435 (plaintiff could not claim breach of an express contractual provision based on introductory

paragraph in which plaintiff stated that he recognized the benefits to be derived from being identified with franchisor because it did not set forth any obligations).  The breach of contract claims are dismissed without prejudice with permission to replead.

       E.      Breach of Duty of Good Faith and Fair Dealing

American Casual alleges that Moe's breached the duty of good faith and fair dealing in violation of O.C.G.A. § 11-1-203, a provision of Georgia's Uniform Commercial Code.  Moe's contends that American Casual's claim fails because O.C.G.A. § 11-1-203 does not apply to a franchise agreement.  The implied obligation of good faith and fair dealing under the UCC applies to the sale of goods only.  Lake Tightsqueeze, Inc. v. Chrysler First Fin. Servs. Corp., 210 Ga. App. 178, 180 (1993). When a contract deals with both goods and services, the contract falls within the scope of the UCC only if the primary, or predominant, purpose of the agreement is the sale of goods.  Crews v. Wahl, 238 Ga. App. 892, 900 (1999); Mail Concepts, Inc. v. Foote & Davies, Inc., 200 Ga. App. 778, 779 (1991); see also BMC Indus., Inc. v. Barth Indus., Inc., 160 F.3d 1322, 1329-30 (11th Cir. 1998) (applying "predominant factor" test to determine whether hybrid contract is a transaction in goods or services).  "If the primary purpose of the agreement is the rendering of services, even if goods are supplied as part of that performance [the court] will view the contract as one for

services with an incidental furnishing of goods, and the UCC does not apply." <u>Mail Concepts, Inc.</u>, 200 Ga. App. at 779.

The Franchise Agreement primarily governs issues regarding the proper operation of a franchise restaurant; advertising; and the use of trademarks, tradenames, and service marks. Conversely, the provisions regarding goods are incidental at best. Moe's profit from the agreement comes from the franchise fee and royalties, not from the sale of its items to American Casual. Under the terms of the Franchise Agreement, American Casual is not required to purchase ingredients, supplies, furnishings, or equipment from Moe's. These items may be purchased from any source, provided that the items conform to Moe's standards and specifications. (Compl., Ex. G ¶ 7(g).) Moe's only requires that American Casual purchase certain paper products and certain hardware and software from suppliers designated by Moe's. However, even then, the suppliers are not affiliated with Moe's and Moe's does not derive any income from these purchases. (Compl., Ex. A, Item 8.) Because the non-sale aspects predominate, O.C.G.A. § 11-1-203 does not apply to the agreement between Moe's and American Casual.

Even if O.C.G.A. § 11-1-203 applied to the Franchise Agreement, or if American Casual had asserted its claim based on the analogous common law doctrine, American Casual cannot state a claim for breach of the duty of good faith and fair

dealing.  O.C.G.A. § 11-1-203 provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement."  However, the failure to act in good faith in the performance of contracts governed by the UCC does not create an independent claim for which relief may be granted.  Stuart Enters. Int'l, Inc. v. Peykan, Inc., 252 Ga. App. 231, 234 (2001);  Lake Tightsqueeze, Inc., 210 Ga. App. at 181.  Similarly, the common law imposes a duty to seek diligently and in good faith to comply with all terms of a contract.  But, as with the UCC, the common law requirement of good faith and fair dealing is not an independent source of duties for the parties to a contract.  Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990).  Rather, the covenant to perform in good faith "modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*."  Stuart Enters. Int'l, Inc., 252 Ga. App. at 234 (quoting Alan's of Atlanta, Inc., 903 F.2d at 1429).  Thus, in order to state a claim for breach of the implied duty of good faith and fair dealing, a plaintiff must set forth facts showing a breach of an actual term of an agreement. General allegations of breach of the implied duty of good faith and fair dealing not tied to a specific contract provision are not actionable.  Alan's of Atlanta, Inc., 903 F.2d at 1429; Tart v. IMV Energy Sys. of Am., Inc., 374 F. Supp. 2d 1172, 1182 (N.D. Ga. 2005).

American Casual alleges that Moe's breached its implied duty to act in good faith by: (1) misrepresenting the "initial investment" expenses and food and labor costs required to develop a Moe's Southwest Grill restaurant; (2) misrepresenting its skill, experience, knowledge, and expertise; and (3) misrepresenting that it had perfected a system of opening and operating Moe's Southwest Grill restaurants. (Compl. ¶ 150.) As discussed above, these alleged misrepresentations do not establish a breach of any contract provision. As such, American Casual cannot show a failure to act in good faith based on these allegations. See Tart, 374 F. Supp. 2d at 1182 (claim failed because alleged breach of implied covenant not raised in connection with a breach of an express term of the agreement); WirelessMD, Inc. v. Healthcare.com Corp., 271 Ga. App. 461, 468-69 (2005) (plaintiff could not state claim for breach of implied covenant of good faith and fair dealing based on failure to market software where defendant had no contractual duty to do so). American Casual does not contend that the alleged breach of the implied duty of good faith and fair dealing is tied to any other contract term. Thus, Moe's is entitled to dismissal of this claim.

F.      Promissory Estoppel

The allegations supporting American Casual's promissory estoppel claim are essentially identical to those asserted in connection with the fraud, negligent misrepresentation, breach of contract, and breach of the duty of good faith and fair

dealing claims.  Specifically, American Casual alleges that Moe's promised that: (1) the initial investment to develop and open a restaurant was between $164,500 and $271,500; (2) it had experience, knowledge, and expertise necessary to provide accurate, clear and concise estimates of the required initial investment expenses; (3) it had perfected a system of opening and operating its restaurants; (4) food costs and labor costs were approximately 23-27% of food sales and 16-20% of gross sales, respectively; and (5) it would appoint Klinghoffer and Hammond to the Moe's governing board.  (Compl. ¶ 156.)  American Casual's promissory estoppel claim incorporates by reference all of the preceding allegations of the Complaint, including those concerning the existence and terms of the written agreements between the parties.  (Compl. ¶ 154.)  Moe's argues that the promissory estoppel claim fails because it is inconsistent with the existence of contracts that cover the alleged promises.  The doctrine of promissory estoppel acts to supply consideration, which would otherwise be lacking, by the reliance of the promisee on the promise of another. Everts v. Century Supply Corp., 264 Ga. App. 218, 220 (2003).  Where parties enter into a contract with bargained for consideration, the terms of which include the promises alleged in support of a promissory estoppel claim, promissory estoppel is not available as a remedy.  See Adkins, 411 F.3d at 1326 (citing Bank of Dade v. Reeves, 257 Ga. 51 (1987)).  Rule 8 of the Federal Rules of Civil Procedure permits a party

to plead alternative and inconsistent claims and theories of recovery.  Fed. R. Civ. P. 8(e)(2).  Thus, a party is generally permitted to plead both promissory estoppel and breach of contract claims in the alternative.  However, American Casual's Complaint does not indicate that its claims are asserted as alternative theories of recovery.  Even if the promissory estoppel claim was asserted in the alternative, American Casual does not allege that the contracts attached to the Complaint are invalid or potentially invalid, nor does Moe's challenge the existence or validity of the agreements.  When neither side disputes the existence of a valid contract, the doctrine of promissory estoppel does not apply, even when it is asserted in the alternative.  Decatur Ventures, LLC v. Stapleton Ventures, Inc., 373 F. Supp. 2d 829, 848-49 (S.D. Ind. 2005); Synesiou v. DesignToMarket, Inc., No. 01-5358, 2002 WL 501494, *4 (E.D. Pa. Apr. 3, 2002).  Thus, Moe's is entitled to dismissal of the promissory estoppel claim.

Moreover, even if American Casual disputed the validity of the written contract and had asserted its claim in the alternative, the majority of its allegations cannot support a claim of promissory estoppel.  To prevail on a promissory estoppel claim under Georgia law, the plaintiff must demonstrate that: (1) the defendant made certain promises; (2) the defendant should have expected the plaintiff to rely on such promises; and (3) the plaintiff relied on those promises to his detriment.  O.C.G.A. § 13-3-44(a); F & W Agriservices, Inc. v. UAP/Ga. Ag. Chem., Inc., 250 Ga. App. 238,

241 (2001).  The threshold requirement for a promissory estoppel claim is that there be some enforceable promise by the defendant.  See <u>Mooney v. Mooney</u>, 245 Ga. App. 780, 783 (2000); <u>Loy's Office Supplies, Inc. v. Steelcase, Inc.</u>, 174 Ga. App. 701, 702 (1985).  A "promise" is "a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."  <u>F & W Agriservices, Inc.</u>, 250 Ga. App. at 241.  The statements regarding initial investment expenses; food and labor costs; Moe's experience, knowledge, and expertise; and Moe's perfected system of opening and operating its franchises are not manifestations of an intention to act or refrain from acting.  They are, as even American Casual asserts, merely representations rather than promises.  (Pl.'s Resp., at 11-12.)  "[P]romissory estoppel requires reliance on a promise, rather than a representation of fact."  <u>Pinnacle Port Community Assoc., Inc. v. Orenstein</u>, 872 F.2d 1536, 1543 (11th Cir. 1989).  American Casual, therefore, cannot establish a promissory estoppel claim based upon these statements.

G.    <u>Unjust Enrichment</u>

"The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated."  <u>Smith Serv. Oil Co. v. Parker</u>, 250 Ga. App. 270, 272 (2001).  Thus, unjust enrichment is available only when there is no legal contract.  <u>Camp Creek</u>

Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1413 (11th Cir. 1998) (citing Regional Pacesetters, Inc. v. Halpern Enters. Inc., 165 Ga. App. 777, 782 (1983)).  American Casual alleges that it "conveyed a benefit on Moe's by paying Moe's fees and expenses and also by duly performing its obligations under the Market Development Agreement, Development/Exclusivity Agreement and Franchise Agreement."  (Compl. ¶ 167.)  Based on this allegation, it is evident that any benefit conferred upon Moe's was triggered by provisions of a contract, the validity of which neither side challenges.  See Tidikis v. Network for Med. Commc'n & Research LLC, --S.E.2d--, 2005 WL 1054964 (Ga. Ct. App. May 6, 2005) (unjust enrichment claim properly dismissed when benefits were conferred in accordance with unchallenged contract).  Although American Casual argues that it is permissible to assert alternative and inconsistent claims, it cannot claim within a single count that there was an agreement and that the Moe's was unjustly enriched.  Allied Vision Group, Inc. v. RLI Professional Techs., Inc., 916 F. Supp. 778, 782 (N.D. Ill. 1996).  Additionally, American Casual's unjust enrichment count also incorporates by reference all of the preceding allegations of the Complaint.  (Compl. ¶ 164.)  As with the promissory estoppel claim, because neither side disputes the existence of a valid contract, the unjust enrichment claim is improper.  Decatur Ventures, LLC, 373 F. Supp. 2d at 849;

Synesiou, 2002 WL 501494, at *4.  Therefore, American Casual fails to state a claim for unjust enrichment and dismissal of this claim is warranted.

## IV.  CONCLUSION

For the reasons set forth above, the Defendant's Motion to Dismiss [Doc. 3] is GRANTED IN PART and DENIED IN PART.  Additionally, pursuant to joint stipulation of the parties, Count II of the Complaint is DISMISSED WITH PREJUDICE.

SO ORDERED, this 4 day of April, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge